Good morning to the court. May it please the court, John Howley appearing for Appellant Mr. Serang. I'd like to ask the court to reserve two minutes for rebuttal. Watch your own time. Thank you. Thank you. It's Appellant's contention that the trial that ought to have occurred in this case did not, that the government's theory of this case, that this arson was committed by James Vox using a key and under instruction and at the request of Appellant Mr. Serang, was not challenged by the available evidence that contradicted that theory. Specifically, and in a nutshell, the evidence omitted from the trial was, to begin, the evidence from the only member of the police department who performed an examination of the exterior of the burned building for signs of forced entry, he in fact found signs of forced entry in the form of what he considered to be fresh marks, prime marks left by an estimate the size of a screwdriver. That there was a video made by that officer that was available to trial counsel that, if presented, would have confirmed the examination done by that officer and would have shown that his observations, in fact, were contemporaneous. That really the lead fire investigator in the case had admitted in his testimony, though not capitalized upon by trial counsel, that there had been no examination made of the locks of the exterior of the building. And, in fact, the same investigator in the report that he prepared of his findings omitted to answer the specific questions about whether or not there had been a forced entry of the building. What is the standard of legal expertise on a defense counsel to cover these evidentiary points? When does the failure of defense counsel to make some use of evidence violate the Strickland test? When reasonable counsel, as measured by established norms, prevailing norms in the legal community, when a standard of reasonable competence is not met. And in this case, the appellant, Mr. Serang, did present evidence in the form of testimony of attorney Lewis Katz, who had examined all of the record in this case and rendered an opinion that, in fact, reasonable counsel would have identified this particular piece of evidence and the corroborating evidence to indicate that there had been a forced entry of this building as being key to the defense. It certainly would have recognized it as being key to the defense. Well, the evidence, to be very specific, was that there might have been an attempt at a forced entry, right? There was no actual evidence that there was a forced entry. Is that right? The basis for concluding that there was not a completed forced entry was that the deadbolt on this particular door was thrown when that door was examined the following day. The strength of that is evidence that there had not been an entry through that door. It depends on the assumption that if the arsonist got through that door, that he did not simply lock it behind himself, which, of course, he may certainly have done. So the fact that the deadbolt was thrown and was in a thrown, closed position the next day doesn't mean that it had been in that condition at the time that the arsonist was trying to get entry. But to go a little further, the evidence, the only evidence that that was fresh was that Jones, is that his name? That's correct. Said on the tape originally that looked fresh, although then there was some question about how he would know that. Well, there was an issue raised about his expertise, which I think fails to observe some distinctions that are important here. On the one hand, there's expertise in the identification of tool marks that can enable an expert by microscopic examination to identify a particular tool mark as having been made by a particular tool. That's not called for in this case. Officer Jones is not being offered to give that kind of testimony. It's not necessary to this defense theory that Officer Jones, who had been an officer for a long time, had been a firefighter previously, looked at that door jam and he made the conclusion based on his own experience that there were fresh pry marks consistent with the size of a screwdriver. And wouldn't that be true in a building more than two or three years older, have lots of efforts to not necessarily a high crime area, but any area that somebody has tried tried the door with a screwdriver or a crowbar or something and didn't. Because the deadbolt or something didn't get in, you'd have marks all over the door. This certainly could be the case that there were marks made. But if they'd accumulated over a period of years, they wouldn't be fresh. And it was this officer Jones. Jones testifies. Yes, he did. He said that his he had declared. And I can quote directly from his declaration that he had signed prior to the hearing that the marks appeared to him to be fresh. And it is certainly my strongest belief that that's exactly the way he testified at the hearing, that it was his view at that time that those marks were fresh. That's why in that examination on a videotape, he pointed to those marks and said, it appears here that there was a forced entry at this an attempted forced entry at this door. Did you want to address the prejudice prong at all? Excuse me. I addressed the prejudice. The accumulation of all this evidence, the testimony of this officer, the only officer in the department to have made this kind of examination, the government's own witness in front of this police officer testifying to to his own belief that there had been. There were signs of a fresh attempt at forced entry together with the absence of. Evidence that the government had followed up on that problem and had resolved the question posed by that, because, in fact, there was no indication that the government had followed up on that finding. Indeed, the chief, I believe it's the chief deputy fire examiner, prepared this report in which he neglected to answer the question about whether or not there had been a forced entry. The fact that Mr. Vox was found with screwdrivers in his possession in his car at the time he was arrested. The fact that Mr. Vox was demonstrably actively lying to this jury in appellant's trial about what he had done in this. And committing this arson with respect to the accelerants that he had used and with respect to the locations of which he had set the fire. Take all those things together. What looks initially like a most formidable prosecution case, an unassailable prosecution case, free of contradiction. What was the evidence that Mr. Serang was with Mr. Vaux in California when they purchased whatever was used in the arson? I believe that the only evidence of Mr. Serang's presence with Mr. Vaux in the incidents in California, having to do with attempting to test burning of a carpet with an accelerant and purchasing some material, that the evidence was worked out with Mr. Vox's testimony. Now, and I believe that that's correct, that there is no independent corroboration of that. It would appear that I would like to reserve a minute of my time. Thank you. Good morning. My name is Frank Papagni. I'm an assistant U.S. attorney out of Eugene. I was the prosecutor in this case. I handled the trial. I handled the direct appeal. I'm here for this matter. I handled the matter at the evidentiary hearing on this 2255. Judge Hogan was the judge. He made factual findings that refute some of what you've heard this morning. For example, an excerpt of record 420 of the government's excerpt of record, the question about fresh crime marks. First of all, we had a patrol officer. The government did not call him to ask about his observations on the videotape, although I mentioned it in passing when he was on the stand to make sure it was acknowledged to the court and to the jury and to the defense lawyer. The reason was patrol officer Jones had no expertise, had no qualifications. Quite frankly, he was just giving his suspicions on an audio tape that was amateurish at best. Judge Hogan recognized that when he saw this tape at the evidentiary hearing. And on page 420, when I cross-examined Mr. Jones, I asked him the question. First of all, he's never testified regarding two marks on a door as an expert. He's never testified as an arson expert or a fire cause expert. Even the defendant's own expert that he called, I forget what his name is now, but even his own arson expert could not say that he would say if those marks were pry marks and that he would have to submit it to a laboratory. Oregon State Police Detective Fields, who's a fire cause investigator. The last thing you said was which expert said this? You mean the defendant's expert said this? Yes, the defendant put on expert a former ATF agent. His name escapes me now. I believe it was Smith. And I cross-examined him, and he acknowledged that even in all this experience, he has never had a lab report say that marks on a door were pry marks caused by a screwdriver or, for that matter, could identify more than consistence with some sort of pry. Same thing was testified to by Donald Murphy with 30 years' experience. So the markers, whether they were pry marks, whether it was a screwdriver or anything else. I don't even think that there was even evidence that they were pry marks. We're going to talk about the door, which never really became a fact at the trial. You have to understand this door. That's the issue, isn't it? Well, yeah, it is the issue. And the reason why it didn't come up at trial is because the defense attorney, Mr. Schrank, with his experience, recognizes a red herring, and as he testified, it wouldn't help a defense case to go ahead and put on the stand incredible testimony in an effort trying to distract the jury from the fact that Mr. Vox had a key. He had a key that he kept in his shaving kit. He had a key that he used the first time he tried to burn down the restaurant. He had a key. Well, not exactly. There was a finding that he had a key. What was the evidence that he had a key? Well, that's kind of interesting because Mr. Serang, when he was first interviewed by an insurance adjuster, said he had keys to the restaurant, and that was tape recorded. That's part of my excerpt of record. And then he's told by the investigator that Mr. Vox had a key when he entered the restaurant because Mr. Vox was caught in the act, at least supposedly used a key. Mr. Serang was surprised by that. Ms. Milkovich, who was also part of the government's theory in the case, she was interviewed, and she could not account for all the keys. In fact, when she gave her deposition on this matter, she still could not account for all the keys. Judge Hogan, in his findings of fact, on page 216 of the excerpt, says as follows. At trial, the government provided evidence of the keys that Milkovich and defendant had for the restaurant. One was missing. Neither Milkovich nor defendant accounted for the missing key. Thus, the court concludes. But from your account, and this is really what I was asking, it doesn't sound that there was really evidence that one was missing. There was evidence that he says he had a key. Right. And that the keys, there might have been one, there might have, Milkovich couldn't account for all the keys. So it might have been missing, it might have been misplaced, it might have, but she didn't know. It was more precise than that, Your Honor. When the ingester interviewed Mr. Serang, he not only said he had the keys to the restaurant, but he said, how about when the locks were last changed two years ago, and that he did still have the keys. Then comes the fact that he's told that Mr. Vox purportedly had a key to enter the restaurant. And then in a statement under oath that he gives in July, he was first interviewed in February. All of a sudden, he doesn't have any of these keys. Milkovich is interviewed, and she can't account for these keys. There is direct testimony from employees that Mr. Vox had visited the restaurant and been given a tour of the restaurant by Mr. Serang prior to the fire, actually prior to the first fire. There were, well, there was one fire, an attempted arson, and then the successful arson. There were three that we talked about, and in the direct appeal, I think this Court has dealt with that issue. My point being is this, getting, trying to get back to this door. This door was a door that had, as you see over here, a crash bar. There was no doorknob on the door to pry open. That was kind of a point that got lost in Mr. Halley's discussion. On top of the door was a deadbolt. This is the mark that I brought up in my cross-examination of the officer saying, couldn't the pry marks that you thought were fresh, and by the way, on page 420, he even admits he couldn't say whether the mark was made that night or the night before or within 24 hours of the fire. I got him to acknowledge that. I got him to acknowledge that he couldn't say it was a pry mark. I got him to acknowledge that he was just speculating. That wasn't part of the affidavit that he signed that was prepared for by Mr. Halley, in which the word surreptitious was used, and he didn't know what that meant. So the point being is this officer was just doing the best he could by giving his suspicions on this audio tape. It was recognized by Mr. Schrank, who was an experienced trial attorney, as was Mr. Koenig, who represented Ms. Malkovich, the other attorney in this case, who both had police officers or private investigators working for them, that this was a red herring. This was not something that was going to be convinced into the jury. And as Mr. Schrank pointed out, how many times do you want to hear Vox say, Vox, who was so devoted to Mr. Halley's client, that he even consulted with him before naming his child, that he had gotten a key from Mr. Serang? The other problem the defense had in this case, Mr. Schrank had in this case, was that Mr. Serang limited Mr. Schrank in trying to point to Ms. Malkovich as being the person that may have given him access to the restaurant and was part of this conspiracy which the government alleged at the time.  The reason for the puzzled look is simply, am I right in recollecting that the attorney in testifying at the habeas proceeding ultimately said I may have screwed up? You're correct in what he said is I may have blown it about the audio tape. He remembers he looked at it, he remembers thinking about it, and he remembers that there was no way he wouldn't have used it if he thought it could have helped impeach Vox. He made a decision, he said, that you don't want to hear Vox say over and over again, I don't know about those pry marks, I don't know if those marks were caused earlier by someone else breaking into the restaurant, I don't know how they got there, I don't know if an employee did that, banging carts or leaving the deadbolt open, leaving that door open. All I know is I had a key that was given to me, and I got rid of the key after the officer, the same officer by the way who testified here, let me go. When I was caught with my backup against the wall as I was leaving the scene of the arson, at the same time he threw away, of course, the propane tank and the torch that he used to light it, as well as the gloves, which was another red herring that we can talk about later, but my excerpt of records shows that in the police reports there was no gloves removed from the car. But this door that we're talking about is a crash bar with a deadbolt. So the question that is left is, and as Judge Hogan points out, the deadbolt, even Mr. Jones admits at the time, was locked from the inside. Mr. Halley is trying to suggest that someone went through this door that has a crash bar, no doorknob, had to pry open the deadbolt and then relock it afterwards. And if you look at the photograph, which is part of my excerpt of records, that's simply not credible. Which gets back to the initial point here. Was Mr. Schrank unreasonable in his tactical decision not to use this red herring? Just one sentence. Why is it incredible? Why couldn't they have just locked the door behind them? Because, first of all, look at the door. It's a metal clad door. It's against a wood frame. It has a deadbolt at the top. It has no door at all but the bottom. As Donald Murphy, who's got 30 years' experience, testified, if you're going to break in, if you want to make a pry, this isn't the door you're going to use. You can go to the front of the restaurant and break one of the panes or windows. There's all sorts of ways to get into this place. It had something like six or seven doors, all of which, by the way, you have photographs of. So it wasn't a credible explanation for why he would go through that door. And that's the question gets back then. Was Mr. Schrank unreasonable in deciding tactically not to try to use this to impeach Mr. Vox? We say that his decision at trial was reasonable not to. And it goes a step further. Jones's opinion was inadmissible hearsay on the audio tape. And despite what Mr. Howley says, Judge Hogan is a gatekeeper of expert testimony, would not have allowed the officer to say after he was voir dired by myself as to his qualifications, his opinion as to what caused the marks, or even if the marks were fresh, or what caused them. He could say, I videotaped it and here's these marks. That would have been about as far as he got to go, if you look at what Judge Hogan wrote in his opinion and the government's position on that. Setting that aside, then the question is, look at the rest of the case. There were 60-some witnesses, over 200 exhibits. We had four fire cause experts testify. We had Donald Murphy, Fields, and Fire Marshal Pratt. And the defense had a fire marshal, or excuse me, an arson expert that they retained, but they decided I think at the last minute not to put on the stand because there was never an issue about the arson. The evidence in this case against Mr. Schrank, Mr. Schrank, as you can see from the excerpt of record that was provided and from Judge Hogan's own findings of facts, was quite overwhelming. So even if you could go so far as to say Mr. Schrank was ineffective in what he did in his decision not to use this audio tape and his officer's opinion, the rest of the evidence in the case left little doubt that this Pepsi-Cola driver who had dinner the night before, well, by the way, in answer to your question about them getting together and testing it, there was a receipt on the propane tank that was found in a box that contained the propane tanks inside the trunk of a car that Mr. Vox had given to Mr. Schrank. We know the connection to Mr. Schrank is in the photograph I provide you. Mr. Vox was nice enough to put on the dashboard a note to Mr. Schrank telling him the gas gauge didn't work. What was important about that receipt was when it was bought a week before the fire. What was even more important about that receipt was where it was bought. It was bought within a mile of Mr. Schrank's brother's house where Mr. Schrank had been staying. Mr. Vox didn't live in that area of the Bay Area of California. He lived over 30 miles away from that area. But there was no evidence, direct evidence, that anybody saw the two cars? Not direct evidence, no. But that circumstantial, as Mr. Schrank said, concerned him the most. Your time is up. Thank you very much. Thank you very much. Yes, thank you. Thank you, Your Honors. With respect to the receipt, the significance of that document rather overstates it. But that document is minimal because all it demonstrates is perhaps the location in which these fire-making supplies were purchased. But Mr. Vox is known to have lived in the Bay Area from where that receipt came. And he is also known to have had a long relationship with Mr. Schrank. And the fact that the particular store that this receipt came from was near the residence of a relative of Mr. Schrank does not add any new dimension to the case. It simply shows that Mr. Vox, who is well-conceited, everybody knows, knows Mr. Schrank, made this particular purchase in the neighborhood, in the region in which he lives and in the neighborhood of a relative of Mr. Schrank. With respect to the key, whether or not the key was, quote, unquote, missing, this was a busy restaurant. The fact that a key perhaps is not precisely accounted for is not a sinister fact. And not a sinister fact. It is difficult to attach much grave importance to the fact that there was less than than perfect accounting of where the who had keys. And the record, in fact, of Mr. Schrank's reaction when he was told that Mr. Vox is believed to have had the key was simply surprised. And says two questions. Could you clarify your theory? It is possible that that entry was made at that door, that the deadbolt, in fact, had not been thrown when the arsonist arrived and that the arsonist succeeded in getting through the door. And if one looks at the picture, one will see that this exterior door, there is nothing but a hole where a doorknob should be. On the other side is what's called a crash bar of exactly the type that's on the doors. Quote, very similar to the type that's in the door here. So there's a hole allowing visual and physical access into the backside of the interior of the crash bar mechanism. So if the crash bar mechanism is the only thing holding that door closed. Well, there's a there's there's access for a person outside that door with a screwdriver to have his chance, take his chance of getting that crash bar to open up. So that's actually a perfectly reasonable door for a for a potential burglar to choose as being a location to attempt entry. And the person would actually have to know something about the inside of the door, right? This individual didn't know Mrs. Rangan knew the restaurant. He's just to continue. Which individual? Mr. Box. You're assuming it was Mr. Box who broke in. Yes. Yes. Under your theory, then, after he got in, he then threw the deadbolt. Yes, he certainly may have done so. Well, I have a hard time saying that you're going to set a building on fire that you're going to want to set the deadbolt to get out. There were six doors. I think that's correct. Could you explain if the whole assumption here that it was Mr. Box who did it one way or the other? What exact difference does it make whether he got in with a key or got in with a deadbolt? But his his story, his testimony for the government is I did it using a key that Mr. Sarang gave me and he gave it to me because he wanted me to burn the restaurant. Well, it turns out that he didn't have a key and he had to break in. Well, then there's a serious problem for his story. If it can be shown that he's not telling the truth about having used a key that, in fact, he had to break into the restaurant. It's not that it couldn't have been done that way. It's not that it's that it's not the way he told the story. Correct. And if he's not able to tell the story correctly about something as basic about whether or not I got in using a key. And this is certainly something that was not casually mentioned by him, but repeated over and over. I use the key. Mr. Sarang gave me. If that's not right, then the government's theory of an inside job has fatal disease. Is there anything in the record indicating a motive for Mr. Fox to burn down the restaurant? Mr. Vox, Mrs. Rang had a long relationship. Mr. Sarang's significant other at the times that this restaurant burned and his partner in this restaurant was Laurie Milkovich, originally a codependent in this case, was convicted of some counts, but then acquitted or whose convictions were reversed for insufficiency of the evidence by this court. Correct. Had had a relationship at one time with Mr. Box. Mr. Box had been succeeded in the attentions in favor of Milkovich by Mr. Sarang. There lies a universally recognized motive for antipathy, and it may well have been the the the motive that that actuated Mr. Box in this case. Thank you very much. Thank you. The case of the United States v. Sarang is submitted.
judges: Goodwin, Hug, Berzon